UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DANIEL BRYANT

      Plaintiff,                                 Civil No. 05-1238-HA

      v.                                OPINION AND ORDER

JO ANNE B. BARNHART, Commissioner of Social
Security,

      Defendant.

**PHIL STUDENBERG**
200 Pine Street
Klamath Falls, Oregon   97601
      Attorney for plaintiff

**KARIN J. IMMERGUT**
United States Attorney
**NEIL J. EVANS**
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon   97204

1 - OPINION AND ORDER

**LEISA A. WOLF**
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington  98104
          Attorneys for defendant


HAGGERTY, Chief Judge:

Plaintiff Daniel Bryant (Bryant or plaintiff) brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for child's benefits under Title II of the Social Security Act and for supplemental security income payments (SSI) under Title XVI of the Social Security Act.  This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).  The Commissioner's final decision is reversed and remanded for an award of benefits.

## BACKGROUND

Bryant was born January 18, 1982, and was twenty-two years old at the time of his hearing.  Tr. 457.[1]  Bryant was diagnosed with mild mental retardation and Attention Deficit/Hyperactivity Disorder (AD/DH).  Tr. 183, 184-185, 301.  He was also diagnosed with AD/HD and borderline intellectual functioning.  Tr. 315.  He attended special education programs up to grade eleven and his education program was geared toward a modified diploma or certificate of attendance.  Tr. 148, 161.  Bryant dropped out of high school for a brief period in 2000 and moved from Gilchrist to Klamath Falls.

---

[1]Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

When Bryant's father died in 1997, he became eligible for survivor benefits under Title II. A child is entitled to benefits on the earnings record of the parent who is deceased if the child is under age eighteen, or eighteen years old or older and has a disability that began before age twenty-two, or is eighteen years or older and a full-time student. 20 C.F.R. § 404.350 (a)(5).

Plaintiff applied for SSI and child benefits in March, 2000. His claim was denied and not appealed. Tr. 18. He continued receiving child benefits while in school until April, 2001. *Id.*

Bryant has no substantial gainful activity (SGA) and no past relevant work. Tr. 25. He worked during the summer of 1999 for the Youth Conservation Corps as part of vocational training for his school program. Tr. 236. He worked at Southern Oregon Goodwill in 2001 as part of an assessment for the state Department of Vocational Rehabilitation Services. Tr. 235. Bryant has been working in sheltered workshop-type employment situations since then. Tr. 235, 237, 285, 484. In 2002 Bryant again applied for child survivor benefits based on childhood disability and adult SSI. After a denial, he appealed and there was a hearing before an Administrative Law Judge (ALJ) on June 17, 2004. The ALJ issued an opinion on August 23, 2004 finding Bryant was not disabled.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner has established a sequential process of up to five steps for determining whether a person is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. At step three, there is a conclusive presumption that the claimant is disabled if the Commissioner determines that the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140, 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). The criteria for these listed impairments, also called Listings, are enumerated in 20 C.F.R. Part 404, subpart P, appendix 1 (Listing of Impairments). If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); Social Security Ruling (SSR) 96-8p.

At step four, the Commissioner assesses the claimant's RFC to perform relevant past work. If the claimant cannot perform past work, the claim proceeds to the fifth step. At step five, the burden shifts to the Commissioner to demonstrate that there are a significant number of jobs in the national economy that the claimant can do given his or her RFC, and factors such as age, education, and work experience. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1560-1566; 416.960-966. If the Commissioner meets this burden, the claimant is not disabled. 20 CFR §§ 404.1566, 416.966.

Bryant challenges the ALJ's evaluation of the evidence and the conclusion at step five of the sequential process.

Individuals seeking a re-entitlement to children's insurance benefits must have a disabling impairment or combination of impairments which "meets or equals a set of criteria in the Listing of Impairments in appendix 1 of this subpart or which, when considered with your age, education, and work experience, would result in a finding that you are disabled under § 404.1594." 20 C.F.R. § 404.1511. The record is not clear regarding whether Bryant received child insurance benefits based solely on age or whether childhood disability was considered. However, the analysis for determining an initial disability for child insurance benefits is functionally the same as for re-entitlement, which is the five step sequential analysis discussed above. 20 C.F.R. § 404.1520.

## THE ALJ FINDINGS

The ALJ found that Bryant's work experiences were classified as sheltered workshop positions and were not substantial gainful activity or past relevant work. Tr. 20, 25. The ALJ determined that:

> The medical evidence indicates that the claimant has borderline intellectual functioning and attention deficit hyperactivity disorder, by history, impairments that are "severe" within the meaning of the Regulations but not "severe" enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No.4.

Tr. 20.

The ALJ found that Bryant's RFC allowed "no exertional limitations, otherwise he can perform simple routine tasks and instructions with only occasional co-worker or public contact." Tr. 26. The ALJ also referred to the testimony of a vocational expert (VE) that with Bryant's RFC there were jobs in the national economy that he could perform. Tr. 25. The ALJ determined that Bryant could make a vocational adjustment to work that exists in significant

numbers in the national economy in jobs such as kitchen helper, warehouse worker, and alternate

title parts picker.  The ALJ found Bryant was not under a disability at any time through the date

of the decision.  Tr. 26.

## STANDARD FOR REVIEW

The Commissioner bears the burden of developing the record.  *DeLorme v. Sullivan*, 924

F.2d 841, 849 (9th Cir. 1991).  The district court must affirm the Commissioner's decision if it is

based on proper legal standards and the findings are supported by substantial evidence in the

record as a whole.  42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  The

court must weigh all of the evidence, whether it supports or detracts from the Commissioner's

decision.  *Id.*, *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's

decision must be upheld, however, even if "the evidence is susceptible to more than one rational

interpretation."  *Andrews*, 53 F.3d at 1039-1040.

## DISCUSSION

Bryant asserts the ALJ's decision is not supported by substantial evidence in the record.

Specifically, he asserts that the ALJ failed to fully address the testimony of lay witnesses,

including Bryant's case manager, his adult foster care provider, and his Goodwill vocational

trainer.  Bryant also asserts that the ALJ erred in not properly addressing or giving weight to the

finding of disability by other agencies.

//

//

## I. **Medical and Vocational Background**

Bryant was held back in first grade due to poor performance. Tr. 183. He was found eligible for special education services in the second grade due to AD/HD and developmental learning disabilities. *Id.* On February 7, 1995, a Psychometric test was performed for his sixth grade Individualized Education Program (IEP), as required by federal law.[2] Bryant was found to perform at a second grade level with behavior issues of a short attention span, "extreme distractability," and a need for "constant monitoring in order to help him attend to activities successfully." Tr. 194. By seventh grade, Bryant's teachers had noted a deterioration in all skill levels and requested assessments.

Georgia Tann, Ph.D., a school psychologist, completed an evaluation and testing of Bryant between November, 1995 and February, 1996. In her Psychoeducational Report, she noted that Bryant's AD/HD diagnosis was supported by a physician's evaluation. Tr. 183. Doctor Tann stated Bryant was involved with the Juvenile Justice system due to sexual involvement with a younger child several years ago, but noted his mother did not know if Bryant had been sexually abused. Bryant's parents had observed hyperactive behavior in their child from the age of five. *Id.*

Doctor Tann determined that academically, plaintiff was four years below grade level and five years below age level. She determined Bryant's IQ was within the mentally deficient range on Weschler Intelligence Scale for Children III (WISC-III). His full scale IQ was 62. Doctor Tann noted the Vineland test for adaptive behavior indicated that plaintiff had significant deficits

---

[2]The Individuals with Disabilities Education Act (IDEA) requires yearly IEPs for students eligible for special education and additional reevaluations whenever there is significant change in performance. 20 U.S.C.A. § 1414.

in all areas of adaptive behavior. His adaptive behavior skills were similar to those demonstrated by children with mental deficiencies. Tr. 184-185. The Behavior Disorders Identification Scale-School Rating Form used by Dr. Tann also indicated problematic behavior. This behavior included not performing or completing assignments, failing classes, not being prepared for class, not following directions, having difficulty with memory and comprehension, not remaining on task, and being unable to follow steps or perform assignments independently. Tr. 186. A classroom observation of Bryant in December 1995 determined that he was on task only forty percent of the time. Tr. 181.

Bryant was referred to the Child Development and Rehabilitation Center for a pediatric evaluation in June of 1996. Doctor Lydia Fusetti completed the physical evaluation portion of the exam and noted that Bryant was taking Ritalin until the sixth grade when his mother stopped administering it due to side effects of headaches and decreased appetite. Doctor Fusetti determined Bryant had mild mental retardation and suggested that a test for Fragile X Syndrome[3] should be considered. Tr. 294-295. However there are no records to indicate that any follow up exams were performed for Fragile X Syndrome.

The psychological part of the evaluation was performed by two psychologists, Drs. Wood and Merten. The psychologists noted that Bryant's recent tests from school indicated he was mentally retarded, rather than having borderline intellectual functioning as originally assessed. The school was also concerned about a deterioration in plaintiff's behavior, skills, and attention.

---

[3]Fragile X Syndrome is a common cause of inherited mental retardation in the United States. It results from a mutation in a single gene. Eighty percent males with Fragile X have IQs of 75 or below. Eighty to ninety percent of males with Fragile X have AD/DH or other attention disorders. National Institutes of Health, National Institute of Child Health and Human Development, available ate www.nichd.nih.gov/publications/pubs/fragilex/index.htm. (Last viewed August 23, 2006).

Tr. 299.  Because a WISC-III test had already been performed, Drs. Wood and Merten tested

Bryant with the Stanford- Binet IV.  The WISC-III indicated an IQ of 62, and the Standord-Binet

indicated a composite IQ of 61.  Tr. 300-301.  The psychologists noted that a comparison of

these tests "indicate that Daniel's cognitive performance has been consistent over this eight

month span . . . operating in the mild range of mental retardation."  Tr. 302.  They further noted

whether his attention difficulties were related to cognitive deficits or attention disorder, his "lack

of attention and follow through would be problematic. . . ."  *Id.*  In addition, they noted "that

Daniel appears to not have the skills to think through consequences before he acts."  Tr. 303.

Addressing the decline noted by the school, the psychologists stated:

> It is probable that while Daniel has made some progress over the years, the rate of
> his learning has not been comparable to that of his age mates. . . .  Daniel is
> further hampered by a curriculum that is becoming increasingly conceptual, while
> he tends to be quite concrete and with limitations in his conceptual understanding
> . . . .  Given that Daniel is a reasonably handsome youngster with adequate social
> skills and no physical abnormalities, this may also lead adults to have higher
> expectations for him than his cognitive abilities will allow.

Tr. 303-304.

In January 1997, during the annual assessment for continuation in special education, the

school's report indicated that Bryant's academic level was between grades two and four, with

most achievement in the third grade range.  Bryant's IEP of February 15, 1997 noted he was

eligible for services because of mental retardation, and the IEP was signed by the school team,

including the school psychologist.  The IEP noted that his IQ test score was two or more

standard deviations below the mean on a standardized IQ test administered in accordance with

OAR 581-15-072.  In addition, Bryant was noted to have deficits in adaptive behavior coexistent

with impairments in intellectual functioning.  Tr. 172, 174.

Bryant's IEP of February 5, 1999 for eleventh grade at Gilchrist School noted his only participation in regular education was for Physical Education. Tr. 161. Bryant's programming was to focus on vocational training and activities of daily living training. *Id.* The IEP team determined:

> Daniel is a student who needs significant and detailed instruction in responsibility, social communication and daily living skills. He is nearing his eighteenth chronological year and is not currently able to live independently. He has very few skills in cooking, shopping, transportation, budgeting, or earning a living. Daniel needs to learn these skills quickly. Academically, Daniel has been unable to be successful in mainstream classes such as English, history or science. He has not earned a drivers license.

Tr. 163. Bryant dropped out of Gilchrist School and special education services on February 18, 2000. Tr. 159.

Bryant enrolled in Klamath Falls Union High School and had an IEP determination for eleventh grade in May, 2000. His educational assessment indicated he was functioning at a fourth grade level. Tr. 147. He was enrolled in resource room classes, vocational education and transition services, with 519 minutes a week in special education and 24 minutes a week in regular education. Tr. 148. His IEP noted a history of behavioral issues but at Klamath Falls he had only demonstrated some "occasional negativity and some truancy." Tr. 149.

The Klamath County Department of Mental Health/Developmental Disabilities (DD) determined that Bryant was developmentally disabled on February 5, 1999 based on mental retardation before his eighteenth birthday. Tr. 306-307. Patricia Graham, Bryant's case manager from the Department of Mental Health/DD assisted him in applying for SSI and child benefits from the Social Security Administration (SSA) in April, 2000.

Ms. Graham completed the Activities of Daily Living (ADL) form on the SSA application.  She indicated she saw Bryant two to three times a week, that he was now in school at Klamath Falls, and was practicing bowling for the Special Olympics.  Tr. 110.  She noted Bryant was in a house with four other young men and had to be reminded to bathe and complete personal hygiene.  Tr. 114.  Ms. Graham further noted he needed assistance to handle money or pay bills, and this was his first independent living situation.  Tr. 116.  She stated "Daniel's behavior interferes with his ability to work on a regular basis, he would need a job coach and the job would have to be modified."  Tr. 117.  Bryant stated on the SSA claimant ADL form that he paid rent and did chores.  Tr. 132-33.

The SSA Teacher Questionnaire was completed by Shannon Holady, the Resource Specialist at Gilchrist School.  She stated Bryant was in her program from January 30, 1991, to February 2000.  Ms. Holady noted that his academic level of achievement was mostly third grade level and when Bryant left school he was working on transitioning into programs through Klamath County Department of Mental Health and STERS.  She noted Bryant was "out of his seat every 15 minutes with or without permission, will occasionally leave the room."  Tr. 128. Ms. Holady noted Bryant had difficulty maintaining concentration and could stay on task about fifteen minutes.  She further noted he was "disruptive during class because he has trouble maintaining focus in his seat.  He cannot sit still and work independently.  He does not always learn from mistakes."  Tr. 128.  Ms. Holady stated Bryant had socialization problems because he "cannot make adequate decisions about right vs. wrong."  She further stated his decision making skills and attention skills are limited and hamper his ability to follow rules or directions appropriately.  Tr. 129.

Bryant's physician, Dr. Michael Scully, determined that Bryant was not capable of managing any benefits he received from SSA. In June, 2000, Dr. Scully noted Bryant had a "history of spending money and food stamps within a few days of getting it, then being without." Tr. 318. Bryant underwent a psychological evaluation for the state agency on May 10, 2000. Doctor Tibbitts, the state agency consultant, administered the Weschler Adult Intelligence Scale III and determined a full scale IQ of 72, which he noted was higher than the previous IQ tests administered by OHSU and the schools. Tr. 313. Doctor Tibbitts also noted that Bryant scored "exceptionally low" in basic skills, scoring in the first percentile. Doctor Tibbitts diagnosed AD/DH, borderline intellectual functioning and a Global Assessment of Functioning (GAF) of 44[4] with a serious impairment in school functioning. Tr. 315.

The state agency determined Bryant was not disabled and developed an RFC based on a Dr. Tibbitt's diagnosis of borderline intellectual functioning. The state agency determined that Bryant had moderate limits in social functioning and concentration, persistence and pace. The state agency worksheet from June, 2000 noted that "he now essentially lives-functions as an 'adult' and appears capable of ADL, chores, shopping, attending school, handling money." Tr. 333. The RFC noted insufficient evidence of episodes of decompensation. The RFC further noted that due to limitations on understanding and memory he should "carry out simple, familiar, repetitive tasks, routine, not involving much literacy, should not deal frequently with public." Tr. 330.

---

[4]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 41 to 50 indicates serious symptoms (suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, few friends, unable to keep a job). The American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 34 (4th ed. 2000).

Bryant's case manager requested a reconsideration of the decision on his behalf in August, 2000 because of changes of circumstances.  She noted, "Daniel has demonstrated, over the past three months that his cognitive disability hinders his ability to be aware of the consequences of not planning ahead or budgeting money." Tr. 139.  She also noted that Bryant was "unaware of the consequences of his behavior or reaction to everyday living situations."  Tr. 139.

Bryant was convicted of sexual abuse of a minor.  An assessment by the Victim's Prevention Program for Sexual Offenders determined the program was inappropriate for him. Tr. 91.  The examiner noted on Bryant's mental status exam that "he clearly scored in the cognitive impaired range." *Id.*  She further questioned whether Bryant was "a sexual offender" noting, "It is fairly typical for developmentally delayed males to form sexual relationships with females at their own level of emotional and mental development.  Therefore, these females would tend to be younger in chronological age." *Id.*  The examiner recommended counseling through an agency that works with the developmentally disabled to address the "concept of personal boundaries and appropriate social skills." *Id.*

Bryant was placed at Goodwill of Southern Oregon (Goodwill) for a vocational assessment with the assistance of a job coach in August, 2001.  Tr. 204.  He was removed after twelve days because of issues with a Goodwill staff person.  Tr. 209.  Bryant's Goodwill employment assessment noted problems with interaction with co-workers, taking direction from supervisors, and working independently.  Tr. 205-206.  The assessment noted that verbal instructions had to be repeated, he would have to re-do tasks and he was better with "hands-on" instruction.  Although Bryant had good numbers "in quantity and quality" in production work, he

had to be reminded several times about inappropriate behavior which "would be a barrier to community employment." *Id.*

In October, 2001, Bryant was court-ordered into adult foster care for violating his probation, which included no contact with a minor. Tr. 87.

Bryant reapplied for social security benefits in July 2002. The disability examiner noted that in the telephone interview, "the claimant has a hard time answering questions. He could not answer questions about his current work at REACH and turned the interview over to his caseworker. He never came back on the line." Tr. 219. Work Activity Questionnaires were completed by Michael Walton, Production Services Manager for REACH, a supported /sheltered workshop experience. He noted that Bryant was given special considerations to allow him to work, stating Bryant needed one-on-one supervision. Tr. 221. He also noted that Bryant was not able to maintain normal production and quality standards when working, his performance was inconsistent, and keeping him focused on one task was difficult. Tr. 244-245.

Bryant's case manager, Barbara Guynn, completed many SSA forms, all consistently stating Bryant's limitations. Ms. Guynn iterated that Bryant is cognitively impaired, needs extra time to complete tasks and needs the extra support of a job coach or sheltered work environment. Tr. 225. She also stated Bryant needs verbal cues throughout the day to complete ADLs and work tasks. *Id.* Ms. Guynn reported that Bryant "can get suggestive and sexual and needs to be redirected to appropriate topics." Tr. 255. She stated Bryant had briefly lived independently, but due to "poor choices" was placed by the court in an adult foster home that provided 24-hour supervision and "assists Daniel in making appropriate choices." Tr. 232. Ms. Guynn noted Bryant received assistance from staff and the foster care provider with chores, shopping, and

laundry.  Tr. 247.  She further stated Bryant did not handle money responsibly and Klamath

County Department of Mental Health is Bryant's Representative Payee and handles his money

and bills.  Tr. 262.  Ms. Guynn also noted, "Daniel doesn't like people to know there is any

disability.  He presents at a high skill level.  He does not process situations well and makes

inappropriate decisions."  Tr. 252.

## II.    <u>Hearing Testimony</u>

At the hearing on June 17, 2004, plaintiff's case manager from Klamath County Mental

Health, Catherine Barnes, testified Bryant could not work a regular 40-hour week and had

particular problems with memory and focus.  Tr. 484-485.  She noted every job he had was

either in a sheltered workshop or supported employment with a job coach and that special

supervision was necessary.  Ms. Barnes noted,  "if he doesn't have that, it falls apart real fast."

*Id.*  She further noted that Bryant lost his foster care placement because there was no "federal

funding" and without it the state would not pay for the placement.  Bryant's former foster

provider "stepped up to the plate and said 'we'll take him.'"  Tr. 484.

Londa Bowen, Bryant's former foster provider, testified that Bryant lives with her family

and pays rent.  She testified he needed "quite a bit of help" with personal hygiene issues,

cooking, and household chores.  Tr. 488.  Ms. Bowen testified Bryant had a hard time staying on

task or completing tasks and she had to continually tell him what needed to be done.  She noted

instructions must be in a step-by-step manner in order for him to accomplish tasks.  Tr. 489-90.

Ms. Bowen testified Bryant could not work a regular 40-hour week, and had difficulties even

working with a job coach.  Tr. 489-490.

Felicia McNair, a Goodwill Employment Specialist, testified she had placed plaintiff in different jobs at Goodwill, but he had behavior problems. Specifically, she noted he could not stay on task and would leave the work area, compelling his job coach to find him and bring him back. Ms. McNair noted Bryant needed constant direction and frequent, consistent support. Tr. 492. She further testified Bryant could not work in the national economy without support and special services. Tr. 493.

Vocational expert Kay Hartgrave testified there were no competitive jobs for an individual unable to accept instructions or respond appropriately. Tr. 497. She testified that regular employers do not ordinarily provide the type of services to an employee that a job coach provides. Tr. 497-498. However, the VE testified that with the RFC developed by the ALJ, an individual could work jobs in the national economy. Tr. 496.

## ANALYSIS

**I.    Child Benefits**

### A.  Listing of Impairments.

The court notes that Bryant applied for continuation of the childhood benefits he received after his father's death. To be entitled to these benefits, Bryant must have a disability that began before age twenty-two.[5] As noted previously, in order to meet the disability requirement for child benefits, Bryant must either have a diagnosed impairment that meets criteria in the Listing of Impairments, or meets the disability requirement under 20 C.F.R. §404.1520. Although the ALJ was required to determine whether Bryant had a disability before that age, the ALJ made no

---

[5]Individuals who have lost their entitlement to child's benefits may be reentitled if they have not married. The "reentitlement may begin with (b) The first month in which you are disabled, if your disability began before you became 22 years old." 20 C.F.R. § 404. 351.

comment on the many medical and educational records in the file pertaining the period from 1991 to 2000.

As noted, Bryant was diagnosed in 1995 and 1996 with IQs of 61 and 62.[6] Under the Listing of Impairments for both adults and children, an IQ between 60 and 70 requires other functional limitations. 20 C.F.R. § 404, subpt. P, app. 1, 12.05, 112.05. Bryant's medical, school, and vocational records demonstrate his AD/DH or attention difficulties significantly compromised his concentration, resulting in behavior that was continually off-task. His school records and testimony from his case manager and foster care providers confirm an inability to perform activities of daily living without constant supervision. The record also demonstrates Bryant's inappropriate social functioning. He was convicted at age eighteen of sexual abuse of a minor and is a registered sex offender. Bryant's work history indicates inappropriate social behavior, and his case manager stated that Bryant needs to be "redirected" from inappropriate sexual suggestions. Tr. 255.

The ALJ stated that Bryant's impairments did not meet "one of the listed impairments in Appendix I, Subpart P, Regulations No. 4." Tr. 25. The ALJ did not discuss Bryant's lengthy and cumulative school records that clearly demonstrate a consistent pattern of difficulty with concentration, performance, social behavior, and activities of daily living. The ALJ also did not discuss the findings of other agencies – specifically, the Klamath County Department of Mental Health/DD and Gilchrist and Klamath Union Schools. Bryant was determined eligible for disability services from these entities before the age of twenty-two based on mental retardation and deficits in adaptive behavior.

---

[6]An IQ or 59 or less meets the Listing for mental retardation. 20 C.F.R. § 404, subpt. P app. 1, 12.05 (b); 112.05 (c)).

The ALJ adopted the diagnosis of Dr. Tibbitts, who found Bryant had AD/DH, an IQ of 72, and a GAF of 44 with severe impairment in school functioning. The ALJ did not comment on Bryant's previous diagnoses by the school psychologist, Dr. Tann, and the OHSU psychologists, Drs. Wood and Merten. The ALJ also did not seek the opinion of an impartial medical expert regarding the discrepancies between Dr. Tibbitts and the other three psychologists.

The opinions of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons based on substantial evidence in the record. *Andrews*, 53 F. 3d at 1043; *Lester v. Chater*, 81 F.3d 821, 830-831 (9th Cir. 1995). Even if the ALJ properly accorded greater weight to Dr. Tibbitt's diagnosis, he or she still must perform an analysis of whether those diagnosed impairments meet or equal a listing and provide specific reasons for his determination.

The determination of whether a mental disorder meets a Listing of Impairments is generally a two-part analysis. The first part is reviewing the medical evidence or diagnosis and the second part is determining the severity of the functional limitations. 20 C.F.R. § 404, subpt. P, app. 1, 12.00, 112.00. The ALJ did not discuss Bryant's long history of functional limitations or the observations of his teachers, case managers and other service providers. Failure to properly consider observations by people who have knowledge of how an individual functions and works when making the functional analysis can amount to legal error. *Schneider v. Commissioner*, 223 F.3d 968, 975 (9th Cir. 2000). Under these circumstances, a remand to the Commissioner to correct this error and perform a proper analysis is unnecessary because Bryant meets the other criteria for disability under 20 C.F.R. §404.1520.

**B. RFC**

The ALJ found that Bryant's work experiences were not substantial gainful activity and did not constitute past relevant work.  Tr. 25.  The remaining question is whether Bryant has an RFC to perform other competitive work in the national economy.  The ALJ determined that Bryant's RFC allowed "no exertional limitations, otherwise he can perform simple routine tasks and instructions with only occasional co-worker or public contact."  Tr. 26.  The ALJ stated that great weight was given to the state agency consultants' opinion that Bryant was capable of performing work in the national economy.

However, the record indicates that the RFC developed by the state agency consultants was based, in part, on the assumption that Bryant was living as an adult, handling his finances, shopping and doing chores.  Tr. 333.  Although Bryant did live independently for a few months, his case worker noted he was unable to handle his finances and Klamath County Department of Mental Health had become his representative payee.  Tr. 262.  His behavior led to court-ordered adult foster care and he received assistance from his providers with shopping, chores and ADL. Tr. 247.

The ALJ also found Bryant's well-documented and diagnosed attention problems were "volitional" based on a comment from Dr. Miller.  Doctor Miller is one of four family practice physicians who treated Bryant at Klamath Falls Open Door Clinic.  Doctor Miller opined "On further questioning, he admits despite . . . the current job and this is mostly volitional inattention and noncooperation."  Tr. 425.  The ALJ cited Dr. Miller's note and wrote, "The reader is referred back to the Medical source statements wherein the claimant candidly acknowledged that

19 - OPINION AND ORDER

his inattention and wandering was a way of controlling the situation, and was volitional and not related to an inability to perform the required job functions."  Tr. 24.

The record does not support this conclusion.  The record from early grade school to plaintiff's sheltered work environments document his condition and it has never been suggested that it is volitional or controlled.  The only disagreement between the examining psychologists is whether Bryant has mild mental retardation and some degree of AD/DH that causes his behavior, or AD/DH with borderline intellectual functioning that causes his behavior.  An ALJ errs by searching the record to find an inconsistency to support a finding while ignoring competent and substantial evidence that suggests an opposite conclusion.  *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984); *Holohan v. Massanari*, 246 F.3d 1195, 1204-1205, (9th Cir. 2001).

The ALJ erred in developing Bryant's RFC.  This RFC failed to include all of Bryant's documented non-exertional impairments.

**C.  Lay Witness Testimony**

Bryant asserts the ALJ improperly rejected the testimony of the lay witnesses.  "Friends, family members, and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition."  *Dodrill v. Shalala*, 12 F.3d 915, 918-919 (9th Cir. 1993).  Such testimony cannot be disregarded without comment.  *Nguyen v. Chater*, 100 F. 3d 1462, 1467 (9th Cir. 1996).  An ALJ discounting lay witness testimony must give reasons that are germane to that witness.  *Dodrill v. Shalala*, 12 F. 3d at 919.

The hearing testimony from Bryant's case manager, foster care provider and Goodwill employment specialist is consistent.  All three testified Bryant cannot work a regular 40-hour week without special consideration and supported employment.  This testimony is consistent

with the written testimony of Bryant's former case managers, teachers, and employers.  The ALJ

cited the testimony of Bryant's new case manager, Catherine Barnes, that Bryant could possibly

work a 40-hour work week with supervision and structure as supporting the proposition that he

could work in a competitive job in the national economy.  However, the issue is not whether

Bryant can work in a sheltered work shop or with a job coach.  That is the history and status of

Bryant's work experience, which the ALJ  acknowledges is not substantial gainful activity.

The ALJ rejected the testimony of the Goodwill employment specialist, Ms. McNair, by

citing the comment of Dr. Miller.  Inconsistency with medical evidence can serve as a reason to

discount lay testimony.  *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001).  However, Dr.

Miller's comment is contradicted by the medical evidence and the record as a whole.  The ALJ

also addresses issues regarding whether or not Bryant can cooperate with job coaches.  Tr. 497-

98.  This is not a dispositive issue regarding regular employment.  Employers do not pay for job

coaches.  Improper analysis of competent lay witness testimony regarding whether a claimant

can work that is favorable to a claimant is not harmless error.  "[A] reviewing court cannot

consider the error harmless unless it can confidently conclude that no reasonable ALJ, when

fully crediting the testimony, could have reached a different disability determination."  *Stout v.*

*Commissioner*, 454 F.3d 1050, 1056 (9th Cir. 2006).

The ALJ proposed two hypothetical questions regarding employment to the VE testifying

at the hearing.  The first hypothetical question presented a twenty-two year-old with an eleventh

grade education[7], no past relevant work and  limited to simple routine tasks and instructions with

---

[7]  The ALJ found Bryant had a limited education, which is considered seventh grade to
eleventh grade.  20 C.F.R. § 404.1564. The educational records indicate that Bryant was not on a
path for a high school diploma, but rather a modified diploma or certificate of attendance.  There
is no dispute in the record that Bryant has never performed above a fourth grade level.

only occasional contact with the public and co-workers.  Tr. 496-97.  The VE testified that there

were jobs in the economy for such a person.  The second hypothetical question contained

additional limitations of being unable to accept instructions or respond appropriately to criticism

from supervisors.  The VE testified these limitations would rule out competitive employment.

*Id.*

 The Commissioner failed to meet the burden of establishing that there were jobs in the

national economy  Bryant can perform.  Bryant has never worked outside of a sheltered

workshop or supported employment situation and there is no substantial evidence he can do so.

The VE testified in response to the second hypothetical question, which more closely

approximates Bryant's limitations, that an individual with those limitations could not work in

competitive employment.  The ALJ's decision was not based on substantial evidence in the

record.

## II.  SSI Claim

 Bryant applied for adult SSI in addition to child survivor benefits.  The determination of

eligibility for SSI benefits follows the five-step sequential analysis.  There is no dispute

regarding the step 1 finding that Bryant has no SGA or the step 2 finding that he has a severe

impairment. The step 3 question of whether Bryant's condition meets or equals a listing is

indirectly raised, and, as discussed above, the ALJ erred in making this determination.  The step

4 finding that Bryant has no past relevant work is not disputed.  Bryant's RFC and the step 5

finding that he has the ability to perform work in the national economy is disputed.  As discussed

above, Bryant's RFC is not based on substantial evidence from the record as a whole.  The RFC

does not contain Bryant's documented non-exertional limitations.  The ALJ erred in discounting

lay witness testimony regarding Bryant's ability to work.  In the step five determination, the Commissioner did not meet her burden that there were jobs in the national economy Bryant could perform.

**III.    <u>Remand</u>**

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  The ALJ erred in the determination of whether Bryant's condition met or equaled the criteria of mental retardation or AD/DH in the Listing of Impairments.  The ALJ also erred in the determination of Bryant's RFC, which was not based on substantial evidence.  The Commissioner did not meet the burden of demonstrating there were jobs in the national economy that Bryant could perform.  The ALJ's decision must be reversed and this matter must be remanded to the Commissioner.  The decision whether to remand for further proceedings turns on the utility of further proceedings.

A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision.  *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989).  The ALJ's decision is based on legal error and his findings are not supported by substantial evidence.  The record is sufficiently developed for a finding that Bryant is disabled and no useful purpose would be served by further administrative proceedings.  Bryant is eligible for disabled adult child benefits as the record supports a finding of disability before age twenty-two.  Bryant is also eligible for SSI benefits.

//

//

**<u>CONCLUSION</u>**

For the foregoing reasons, the Commissioner's decision regarding Daniel Bryant is

REVERSED and REMANDED for an award of benefits pursuant to sentence four of 42 U.S.C. §

405(g) for further proceedings consistent with this Opinion and Order.

IT IS SO ORDERED.

DATED this __31__ day of August,2006.


_____/s/Ancer L.Haggerty_____
　　　　　　　　　　　　Ancer Haggerty
　　　　　　　　　　　United States District Judge